UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
*Tampa Division*

| | |
|---|---|
| In re:<br><br>ALPHAROCK LLC, et al.,<br><br>Debtors, | Chapter 11<br><br>Case No. 8:09-bk-11888-CPM<br><br>(Jointly Administered with cases 8:09-bk-11891; 8:09-bk-11892; 8:09-bk-11894; 9:09-bk-11897; 8:09-bk-11899; 8:09-bk-11900; 8:09-bk-11902 through 8:09-bk-11908; 8:09-bk-11910; 8:09-bk-11912; 8:09-bk-11914 through 8:09-bk-11920) |

## OBJECTION OF THE CIT GROUP/EQUIPMENT FINANCING, INC., TO PLAN CONFIRMATION

The CIT Group/Equipment Financing, Inc. ("CIT") hereby files its objection to confirmation of the Second Amended and Restated Joint Plan of Reorganization for AlphaRock LLC and its wholly-owned subsidiaries (the "Plan") filed by the Debtors, AlphaRock LLC, et al. ("Debtors"), and in support thereof states as follows:

### FACTS

1. On or about June 5, 2009 (the "Petition Date") the Debtors filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Code").

2. The Debtors have retained possession and control of their assets as a debtor in possession.

3. CIT is a secured creditor in this case and, as of the petition date was due $9,014,557.18. CIT made loans and advances and granted other financial accommodations to AlphaRock pursuant to a Master Security Agreement dated as of August 21, 2007, and a series of Schedules to the Master Security Agreement.

4. On or about August 4-5, 2009, the Debtors filed a Joint Plan of Reorganization for Alpharock LLC and its wholly-owned subsidiaries and a First Amendment thereto.

5. The Confirmation on the Debtors First Amended Joint Plan of Reorganization was held on October 1, 2009.

6. The Debtors failed to confirm their first Amended Joint Plan of Reorganization. The Court continued confirmation until December 11, 2009 and ordered the major parties to mediation before Zala Forizs.

7. The parties participated in two days of mediation and while CIT believes progress was made, the parties were unable to reach agreement.

8. On December 22, 2009, the Debtors filed their Second Amended Disclosure Statement (Docket No. 255) and Second Amended Plan of Reorganization (Docket No. 253).

9. The Plan proposes to bifurcate CIT's claim, designating an aggregate of $1.5 million of the amounts owed CIT as Class 2 secured claims, and the remainder of the amounts owed CIT as a Class 5 unsecured claim.

10. The secured Class 2 claims are further subdivided into 22 lettered claims each with an amount allocated to it and each tied to one of the 21 Debtors with a six-digit number in its name or to Debtor Alpha CML LLC (each a "<u>Subsidiary Debtor</u>") and its respective assets, in which CIT holds a security interest.

11. The Plan does not recognize a secured claim against AlphaRock LLC, the parent of the Subsidiary Debtors, even though AlphaRock LLC was a signatory to the Master Security Agreement governing the security interests in the 22 Class 2 classes, is a primary obligor on the

indebtedness of all 22 Subsidiary Debtors and listed CIT as a secured creditor in its filed Schedules.

12. The Debtors propose the following treatment of various classes under the Plan.

   a. For each of the Class 2 Secured Claims of CIT, On the Effective Date, the existing CIT loan documents shall be modified as set forth in the Plan and [the respective Subsidiary Debtor shall pay the Allowed Class 2-[respectively lettered] Claim (which amount is set forth [in a table at the end of Plan § 5.04w]) as follows: The Allowed Class Claim (sic) shall be amortized over seven years and shall be paid as follows: Commencing on the first day of the month following the Effective Date and continuing on the first day of each succeeding month [the respective Subsidiary Debtor] shall make equal monthly principal and interest installments at seven percent (7%) per annum. Class 2-[respectively lettered] is Impaired.

   b. CIT's Class 5 claim is being treated as follows: Commencing on the first day that is six (6) months following the completion of payments to CIT on account of its Class 2 Claims, and continuing thereafter on the first of the month on an annual basis for three years, the Debtor shall pay to CIT the Annual Excess Cash Flow. Class 5 is Impaired.

   c. Class 7 comprises all other Allowed Unsecured Claims not otherwise classified in the Plan. Commencing on the first day of the month that is six (6) months following the Effective Date and continuing thereafter on the first day of the month on an annual basis until the earlier of: (a) payment in full of All Allowed Class 7 Claims or (b) seven (7) years following the Effective Date, the Debtors shall pay an amount to Holders of Allowed Claims in Class 7 equal to such Holder's Pro Rata share of the Annual Excess Cash Flow. Class 7 is Impaired.

   d. For Classes 9 and 10, which comprise all Membership Interests in AlphaRock LLC and the Subsidiary Debtors, all Membership Interests are subject to a potential auction. Class 9, which is the Alpha Rock Membership Interests, is also proposing to pay a Plan Contribution Amount in an amount not less than Seven Hundred Thousand Dollars ($700,000.00). No distributions will be made under the Plan on account of the Membership Interests. Classes 9 and 10 are Impaired.

13. The Plan also contains the following provisions:

   a. Section 8.03: "Revestment of Assets to Reorganized Debtors. On the Effective Date, except as otherwise expressly provided in the Plan, the Reorganized Debtors will be revested with all of their assets free and clear of any and all Liens, Debts, obligations, Claims, Cure Claims, Liabilities, Membership Interests, and all other interests of every kind and nature."

3

b. Section 11.05: Injunction in Favor of Guarantors. As long as the Debtors are not in Default on the payments to CIT, Dunkin' Donuts, and Baskin-Robbins called for under the Plan, CIT, Dunkin' Brands, Dunkin' Donuts, and Baskin-Robbins shall be permanently enjoined and forever barred from taking any of the following actions: (a) commencing or continuing in any manner any action or other proceeding against the Guarantors; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Guarantors; (c) creating, perfecting or enforcing any Lien or encumbrance against the Guarantors; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Guarantors; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Guarantors. The Debtors and the Guarantors shall have the right to independently seek enforcement of this injunction provision. This injunction provision is an integral part of the Plan and is essential to its implementation.

# ARGUMENT

## A. The Plan Should Not Be Confirmed.

In order to confirm a plan of reorganization, a plan proponent must satisfy each of the elements set forth in 11 U.S.C. §1129. ("The court shall confirm a plan only if all of the following requirements are met." 11 U.S.C. §1129(a)); *Mercury Capital Corp. v. Milford Conn. Assoc's, L.P.*, 354 B.R. 1 (D. Conn. 2006) ("To be confirmable, a reorganization plan must first meet all of the requirements set forth in the Bankruptcy Code, 11 U.S.C. §1129(a)."). The burden of demonstrating this unequivocal compliance with §1129's mandates rests squarely with the Debtor in this case. *See, e.g., In re Piece Goods Shops Co., L.P.*, 188 B.R. 778 (Bankr. M.D.N.C. 1995); *see also In re Varriale, Ltd.*, 188 B.R. 754 (Bankr. S.D.N.Y. 1995). Consensual confirmation requires compliance with each requirement of §1129(a), including §1129(a)(8)'s requirement that each impaired class either vote to accept the plan, or be left unimpaired by the plan. 11 U.S.C. §1129(a)(8).

The failure to receive the acceptance of all impaired classes, which will not occur in this case, precludes confirmation unless the plan proponent can satisfy the requirements set forth in §1129(b) and commonly referred to as "cram down" of dissenting classes. *See Bank of Am. Nat'l Trust & Savings Ass'n v. 203 North LaSalle St. P'ship*, 526 U.S. 434 (1999). "There are two conditions for cram down. First, all requirements of §1129(a) must be met (save for the plan's acceptance by each impaired class of claims or interests, see §1129(a)(8)).... Second, the objection of an impaired creditor class may be overridden only if the 'the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.' §1129(b)(1)." *Id.* at 441. As to a dissenting class, such as CIT, a plan may be found fair and equitable only if (1) the value of the claim is paid in full, § 1129(b)(2)(B)(i), or (2) the debtor meets the absolute priority rule.

As discussed in greater detail below, because the Debtors do not meet any of the requirements for the Plan to be fair and equitable, it must not be confirmed.

**B.     The Plan Is Not Feasible.**

Under Section 1129(a)(11) of the Bankruptcy Code, a plan cannot be confirmed if the plan is not feasible and is likely to be followed by the liquidation, or by the need for further financial reorganization, of the debtor. In determining whether a plan is feasible, the Court must consider "independently whether the plan is workable and has a reasonable likelihood of success." *In re 8313 Fourth Ave. Corp.*, 172 B.R. 725, 734 (Bankr. E.D.N.Y. 1994), *citing In re Drexel Burnham Lambert Group*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992).

In order to meet their burden regarding feasibility, the Debtors must offer concrete evidence, and cannot rely on speculative, conjectural or unrealistic projections. *See, In re Nelson*, 84 B.R. 90, 93 (Bankr. W.D. Tex. 1988). The only projections the Debtors have supplied in support of their Plan are attached to their December 22, 2009 Second Amended Disclosure Statement ("Disclosure Statement") as Exhibit A. The Disclosure Statement does not disclose the basis for any of the projections or any historical data against which to compare the projections. Nor does it contain any analysis or explanation of the assumptions used in making projections of future income and expenses that will generate the cash flow necessary to fund payments to creditors under the Plan.

As CIT has requested a meeting in person with the Debtors' financial people but unfortunately that meeting will not occur until after the deadline for the filing of this objection. The meeting is scheduled to occur prior to the January 28, 2010 confirmation hearing.

Review of the projections in the Disclosure Statement reveals that the Debtors project annual year-over-year increases in total sales which, when compounded, project that in ten years the Debtors project sales will have increased by approximately 39 percent over year one sales.

6

There is no data to support this constant upward trajectory. Published data of all sorts do not support it. For example, the United States Bureau of Labor Statistics in 2005-2006 projected an annual growth rate of only 2.8% in personal consumption expenditures over the ten-year period ending in 2014.[1] It has projected growth in the US labor force of only 8.5% over the ten year period ending in 2016.[2]

The Debtors' projections as to the expenses they will incur are also unexplained. They appear to reflect assumed annual increases in all expense categories of 3%, including such categories as health insurance premiums that have consistently experienced annual increases at higher rates.[3]

Exhibit B of the Disclosure Statement reflects the Debtors' assumptions as to the amounts of claims. On Page 4 of 4, they appear to assume secured claims of $8,857,385 and unsecured claims of only $187,138. As indicated above, CIT's secured claim alone is $9,014,557.18. The claim register for AlphaRock LLC alone reflects unsecured claims of $741,073 – almost four times the amount assumed for all Debtors combined.

The Court should infer that projected revenues are overly optimistic, that likely expenses are understated and that the project cash flows will not materialize. The Court should reject the Debtors' projections as speculative, conjectural or unrealistic and conclude that the Plan is not feasible.

### C. The Plan Violates the Absolute Priority Rule.

One of the requirements under § 1129(b)(2)(C)(ii) to "cram down" a class of creditors is that "the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property," unless the impaired class

---

[1] http://www.bls.gov/opub/ooq/2005/winter/art04.pdf at 44.
[2] http://www.bls.gov/news.release/ecopro.t10.htm .
[3] In only two years from 1992 through 2004 were annual increases in health costs at 3% or less. http://www.bls.gov/opub/mlr/2004/11/art5full.pdf at 51.

7

is paid in full. As discussed above, the Debtors will likely not be able to fulfill their obligations to pay their unsecured claims. Therefore, under § 1129(b)(2)(C)(ii), the Debtors' interest holders may not retain their equity interest in the Debtors.

> The absolute priority rule, in its simplest terms, requires that creditors of a debtor in bankruptcy reorganization receive payment of their claims in their established order of priority, and that they receive payment in full before lesser interest – such as those of [debtors-in-possession] – share in the assets of the reorganized entity. *In re Rocha*, 179 B.R. 305, 306-307 (Bankr. M.D. Fla. 1995) (Funk, J.), *quoting*, *In re Yasparro*, 100 B.R. 91 (Bankr. M.D. Fla. 1989).

Under the Plan, it appears that some of the insiders of the Debtor propose to retain all equity interests for a payment of at least $700,000.00. At the same time, it is possible that CIT's Class 5 Claim will receive no payments on account of the claim. Also, in exchange for the payment of the $700,000.00, at least some of the contributing insiders will receive at least $2,850,000.00 from the Debtor in the first ten years of the Plan according to the terms and conditions of the Plan. This is a direct violation of the absolute priority rule and the proposed plan *cannot* be confirmed. There is a corollary to the absolute priority rule relating to new value. That is, equity can be retained if there is a new value contribution that is (i) necessary for reorganization, (ii) in the form of money or money's worth and (iii) reasonably equivalent to the interest retained. *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106, 121-22 (1939). Here, to the extent the insiders are contributing no new value, it is only to fund operations, something they should be funding anyway, and not to pay creditors. As a result, the insiders cannot take advantage of this exception.

### D. The Plan Contains Impermissible and Unjustified Injunctions for the Benefit of Non-Debtors.

Section 11.05 of the Plan would shield the Debtors' insiders – most of whom individually guaranteed CIT's debt – from ever being held liable on their personal guarantees. Section 11.05 contains sweeping injunctive relief that would preclude CIT from pursuing the individual

guarantors, thereby effectively giving them the benefit of a discharge in bankruptcy without their ever subjecting their personal assets to the scrutiny of a bankruptcy court or to the burdens of a personal proceeding. Such relief is not warranted under the Bankruptcy Code. *See In re Zale Corp.*, 62 F.3d 746, 761 (5th Cir. 1995) (prohibiting issuance of third-party releases and/or injunctions).

CIT's claims are not paid in full under the Plan. CIT does not consent to the proposed injunction. Additionally, the treatment to CIT is inequitable vis-à-vis the other parties impacted by Section 11.05 of the Plan and such inequitable treatment also invalidates Section 11.05.

Section 524(e) of the Bankruptcy Code explicitly states that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for such debt[.]" 11 U.S.C. § 524(e). Based on this provision, at least three circuit courts have held that permanent injunctions discharging non-debtors from liability are not allowed in reorganization plans. *See Resorts Int'l, Inc. v. Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir. 1995) ("This Court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."); *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760 (5th Cir. 1995) (permanent injunctions discharging a potential debt of a nondebtor are not allowed by bankruptcy code); *Landsing Diversified Props. — II v. First Nat'l Bank & Trust Co. (In re Western Real Estate Fund, Inc.)*, 922 F.2d 592, 601-602 (10th Cir. 1990), *modified sub nom., Abel v. West*, 932 F.2d 898 (10th Cir. 1991) (holding that the automatic stay "may not be extended post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to the creditor.").

Those circuits that have permitted permanent injunctions against non-debtor parties have done so only when specific factors are present.[4] Some courts have considered factors including the following:

> (1) The third party made an important contribution to the reorganization;
>
> (2) The release is "essential" or "important" to the reorganization;
>
> (3) A large majority of the impacted creditors has approved the plan containing the release;
>
> (4) A close connection between the cases against the third party and the case against the debtor exists; and
>
> (5) The plan provides for the payment of substantially all of the claims affected by the release.

*In re Prussia Assoc's*, 322 B.R. 572, 597 (Bankr. E.D. Pa. 2005); *In re Seatco, Inc.*, 257 B.R. at 474 (Bankr. N.D. Tex.). *See also In re Mahoney Hawkes, LLP*, 289 B.R. 285, 297-98, 302-03 (Bankr. D. Mass. 2002) (concluding that plan with permanent injunction could not be approved because partners failed to "resoundingly demonstrate" that they met five factor test).

Other Courts have adopted these additional factors:

1. There is an identity of interests between the debtor and the third-party, usually an indemnity relationship, such that a suit against the non-debtor is in essence, a suit against the debtor or will deplete the assets of the estate;

2. The impacted class, or classes, has overwhelmingly voted to accept the Plans;

---

[4] *See Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648, 658 (6th Cir.), cert. *denied*, 537 U.S. 816, 123 S.Ct. 85, 154 L.Ed.2d 21 (2002) (ruling that non-consensual third-party injunctions are appropriate only when unusual circumstances exist and that certain factors must be present to support a finding of "unusual circumstances."); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2nd Cir. 1992) ("[A] court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization."); *Menard-Sanford v. Mabey (In re A.H. Robins Co., Inc.)*, 880 F.2d 694, 700-02 (4th Cir. 1989) (permitting permanent injunction against non-debtor party where the plan of reorganization was "overwhelmingly approved" and success of plan hinged on prevention of "suits against parties who would have indemnity or contribution claims against the debtor.").

3. The Plan provides a mechanism to pay [in full] for all, or substantially all, of the class or claims affected by the injunction; and

4. The bankruptcy court made a record of specific factual findings that support its conclusions

In re Dow Corning Corp;, 280 F.3d 648 (6th Circ. 2002).

In reviewing the injunction proposed by Section 11.05 of the Plan, the Court also needs to consider whether the temporary injunction in the Plan may functionally amount to a permanent injunction. In re Continental Airlines, 203 F.3d 203 (3d Cir. 2000).

Additionally, the Court needs to determine, to the extent it weighs the matter, whether payment of $700,000.00, at least some of which will go to operations of the Debtors' business, is fair consideration to avoid liability on the guaranty of more than $9,000,000.00. This is particularly true when the Plan at best only commits to paying CIT $1,500,000.00 over seven years at 7% interest and proposes to start paying the insiders more money on an annual basis than in being paid to CIT on its secured claim beginning in year 4.

### E. The Plan Is Not Fair and Equitable to CIT and Was Not Proposed in Good Faith.

The Plan fails the tests of fairness and good faith in several respects. First, the Plan does not recognize a secured claim against AlphaRock LLC, the parent of the Subsidiary Debtors, even though AlphaRock LLC was a signatory to the Master Security Agreement governing the security interests in the 22 Class 2 classes, is a primary obligor on the indebtedness of all 22 Subsidiary Debtors and listed CIT as a secured creditor in its filed Schedules.

Second, the Plan requires deferral of any payments on CIT's unsecured deficiency claim for at least seven-and-a-half years while proposing to pay all other unsecured creditors in full during the first seven years of the Plan. Additionally, during that time the Plan proposes to pay

11

the Debtor's officers $1,300,000.00, and provides a mechanism for the Debtor to make additional discretionary payments to insiders.

Even under the overly optimistic assumptions of the Debtors' projections, given the quantum of claims already filed, it will very possible that CIT may never receive a penny on its unsecured claim. It is also uncertain how much the Debtor will pay on the unsecured claim, and it will be ten (10) years or more before that is determined. Requiring such a long payment term is unfair and inconsistent with good faith. Moreover, there is no basis for discriminating against CIT's unsecured deficiency claim in favor of the holders of those unsecured creditors in Class 7.

Third, the Plan fails to preserve CIT's security interest in the assets of the Debtors. Section 8.03 of the Plan calls for the revesting of the Debtors' assets free and clear of all liens. No exception for CIT's security interest is provided for.

Fourth, the Plan eliminates the cross-collateralization of the debtors of the Subsidiary Debtors that CIT bargained for. Section 2 of the Master Security Agreement, which governs the security interests of each and every Subsidiary Debtor, provides: "Each item of Collateral shall secure not only the specific amount which Debtor promise to pay in each Schedule, but also all other present and future indebtedness or obligations of Debtor to Secured Party of every kind and nature whatsoever." However, by separating the obligations of each Subsidiary Debtor from those of the others, the Plan would insulate each Subsidiary Debtor from the full extent of the debts to which its assets is now subject. If one of the Subsidiary Debtors is extremely successful and pays off its Plan liabilities, its assets will be free of liability in the event other Subsidiary Debtors default.

Fifth, the projections of the Plan contemplate officer salaries – presumably for a number of the interest holders who would also benefit from the proposed injunction – starting in year 2 at $200,000 a year. In year 4 they jump to $300,000 even though <u>negative</u> cash flow is projected

for that year. They jump again in years 7-11 to $400,000, $500,000, $550,000, $600,000, and $650,000 respectively, even though CIT will still be waiting to be paid.

Sixth, CIT's unsecured claim is to be paid out of the Annual Excess Cash Flow ( a term not actually defined in the Plan, but CIT assumes it is the same as Annual Cash Flow, a defined term). The Plan provides at Section 8.07 that the Debtors may, in the exercise of their reasonable business judgment, pay salaries to insiders for their services to Debtor out of the Annual Cash Flow, further making Debtors' projections meaningless.

# CONCLUSION

For all of the foregoing reasons, the Court must deny confirmation of the Debtors' Plan.

**THE CIT GROUP/EQUIPMENT FINANCING, INC.**

By its attorney,

HOLLAND & KNIGHT LLP

 /s/  W. Keith Fendrick
Florida Bar No. 612154
100 North Tampa Street, Suite 4100
Tampa, FL 33602
keith.fendrick@hklaw.com
(813) 227-6707     Fax: (813) 229-0134
Attorney for The CIT Group/Equipment
Financing, Inc.

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by either the Court's electronic notification system, or by U.S. mail this 21st day of January, 2010, to:

*Debtor, Debtor's Attorney, U.S. Trustee*

Dunkin Donuts Franchising, LLC
Attn: Donna Pelissier, Contract Administrator
130 Royall St.
Canton, MA 02021

Dunkin Brands, Inc.
Attn: Donna Pelissier, Contract Administrator
130 Royall St.
Canton, MA 02021

Baskin-Robbins Franchising, LLC
Attn: Donna Pelissier, Contract Administrator
130 Royall St.
Canton, MA 02021

The CIT Group/Equipment Financing, Inc.
Brian R. St. James, Esquire
One CIT Drive
Livingston, NJ 07039

/s/ Keith Fendrick
Attorney

# 8843113_v1